UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MYLES STEELE and<br>CAMERON FERNER,<br><br>Defendants. | Case No. MJ20-252MAT-RSL<br><br>ORDER DENYING MOTION<br>TO DISMISS COMPLAINT |

This matter comes before the Court on referral for the purpose of ruling on defendants' "Objections and Motion to Dismiss Complaint Due to Lack of Probable Cause." Dkt. #41. The government has also filed a motion for leave to file an overlength response (Dkt. #45), which is GRANTED. Having reviewed the memoranda of the parties and the record contained herein, the Court finds as follows:

### I.   FACTUAL BACKGROUND

Defendants Myles Steele and Cameron Ferner are Canadian citizens. On May 15, 2020, defendants were traveling by car from Red Deer, Alberta, Canada, to British Columbia. At approximately 5:11 p.m., Steele, who was driving, used GPS to search for their destination, a Save-On-Foods in Langley, British Columbia. Dkt. #22-1. At 5:54 p.m., Steele searched for directions to "15327 153st south surrey" and received directions to "15327 153 St, Surrey, BC." Id. At 6:20 p.m., Steele searched for "15316 20 a St," id., an address that does not exist. It appears that Steele's GPS instead gave him directions to "A St, Blaine, WA 98230, USA." Id.;

ORDER DENYING MOTION TO DISMISS COMPLAINT - 1

Dkt. #22-2.  At 6:26 p.m., Steele searched for "15316 20 a ave" which resulted in his GPS providing directions to "15316 20a Ave, Surrey, BC V4A 8G2."  Dkt. #22-1.

Due to their alleged error, defendants proceeded down a one-way road toward the Pacific Highway Port of Entry ("POE") near Blaine, Washington, at the United States-Canada border. At or around 6:26 p.m., border patrol officers observed defendants' vehicle in a truck holding area "just north of the actual border" near the POE.  Dkt. #34-1 at 7:7-8:12.  Defendants allege that they missed a turn, and by the time they reached the truck holding area, they were approximately a quarter mile north of 1st Avenue, the last turnoff before the one-way street leading into the POE.  Id. at 9:2-11.  The border patrol officers witnessed the car "driving throughout the staging area, appearing to look for an exit."  Id. at 10:16-18.  They "waved [defendants] up" to the border and instructed them that "the only way" to get back to Canada was to come through the checkpoint into the United States, and then turn back around into Canada.  Id. at 12:22-13:16; Dkt. #34-2 at 19:18-23.

The parties appear to agree that defendants did not intend to cross the United States-Canada border.  Defendants were not carrying proper identification to cross the border, and as defendants point out, cross-border traffic at the time was limited to "essential travel" due to the COVID-19 pandemic, and was thus greatly reduced.  Dkts. #34-1 at 17:23-18:6, #34-2 at 7:14-21. Still, defendants "listened to the directions from the officers and drove to the U.S. port of entry," Dkt. #34-2 at 23:9-11, passing through the first checkpoint at approximately 6:34 p.m. At approximately 6:35 p.m., an exchange between two border patrol officers proceeded as follows:

> Officer A:  I'm guessing they got lost.
>
> Officer B:  Yeah.  GPS.  Girlfriend's car.  He's a truck driver.  They both (unintelligible).  One guy had a medical card, no driver's license.  The other guy had a driver's license (unintelligible).  They didn't seem too (unintelligible).
>
> Officer A:  (Unintelligible).
>
> Officer B.:  Yeah.  You scared the shit out of them.  Now, number two. Realistically, what grounds do you have to stand on when you sat down

ORDER DENYING MOTION TO DISMISS COMPLAINT - 2

>there and you made them come to the US?  Because obviously, they're trying not to.  And you went down there and flagged them up.

Dkts. #35, #38.

Defendants were referred to a secondary inspection, and Ferner was asked to step out of the vehicle.  Dkt. #1 at ¶¶ 7-8.  Officers discovered a bag containing 3.97 grams of cocaine in the passenger side door where he had been sitting.  Id. at ¶ 8.  They also found 6.71 grams of heroin in Ferner's pants pocket.  Id.  Steele was also asked to step out of the vehicle, and officers found a bag containing over $60,000 Canadian dollars at the driver's side floorboards.  Id. at ¶ 9.  In addition, the officers found a hidden compartment in the rear seat of the car, which contained approximately 2.06 kilograms of methamphetamine and 0.52 kilograms of cocaine.  Id. at ¶¶ 10-11.  Finally, the officers found several notebooks that appeared to be drug ledgers.  Id. ¶ 12.  Special Agents Thomas LeCompte and Sara Sherrod of Homeland Security Investigations arrested defendants at approximately 9:30 p.m.  Id. at ¶¶ 13-14.

## II.     PROCEDURAL HISTORY

On May 16, 2020, defendants were charged by complaint[1] with possession of methamphetamine and cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 841(b)(1)(B)(ii), and 18 U.S.C. § 2.  Dkt. #1.  Ferner was also charged with possession of heroin with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2.  Id.  Defendants made initial appearances before the Honorable Mary Alice Theiler, United States Magistrate Judge, on May 18, 2020, and were ordered detained.  See Dkts. #8, #12.  Steele was subsequently released on bond on May 21, 2020.  Dkts. #16, #17.  Steele and Ferner appeared before the Honorable Michelle L. Peterson, United States Magistrate Judge, for preliminary hearings on June 1, 2020, and June 3, 2020, respectively.

---

[1] On June 19, 2020, Judge Peterson issued an order granting the government's motion to extend the deadline to seek indictments against defendants, and extending the indictment deadline to August 31, 2020.  See Dkt. #42.  The Order was granted in large part based on challenges caused by the COVID-19 pandemic, and the General Orders of this District regarding the impact of COVID-19 on grand jury proceedings.  The government asserts that COVID-19 has continued to prevent it from presenting defendants' case to a grand jury at this time.  Dkt. #44 at 4.

ORDER DENYING MOTION TO DISMISS COMPLAINT - 3

Dkts. #23, 26.  A supplemental preliminary hearing was held on June 11, 2020.  Dkt. #39.  On June 15, 2020, Judge Peterson issued an order finding probable cause and denying defendants' request to dismiss the complaint.  Dkt. #40.

### III.   JURISDICTION

Although the government asserts that there is no statutory or rule-based "right to appeal" a magistrate judge's probable cause finding, see Dkt. #44 at 5-6 (citing United States v. Saldana-Beltran, 37 F. Supp. 3d 1180, 1183-85 (S.D. Cal. 2014)), it concedes that the Court may, in its discretion, exercise its "general supervisory authority to review the decisions of a federal magistrate judge acting pursuant to 28 U.S.C. § 636(b)." Saldana-Beltran, 37 F. Supp. 3d at 1185.  The Court will exercise its discretion to review Judge Peterson's probable cause finding and will consider the merits of defendants' motion.[2]

### IV.   LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure ("Rule") 5.1(e), if at the preliminary hearing, "the magistrate judge finds probable cause to believe an offense has been committed and the defendant committed it, the magistrate judge must promptly require the defendant to appear for further proceedings." Fed. R. Crim. P. 5.1(e).  "Probable cause signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." Coleman v. Burnett, 477 F.2d 1187, 1202 (D.C. Cir. 1973); see also United States v. Lopez, 482 F.3d 1067, 1072 (9th Cir. 2007).  "If the magistrate judge finds no probable cause to believe an offense has been committed or the defendant committed it, the magistrate judge must dismiss the complaint and discharge the defendant." Fed. R. Crim. P. 5.1(f).  "A discharge does not preclude the government from later prosecuting the defendant for the same offense." Id.

Defendants are charged under 21 U.S.C. § 841(a)(1), which makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with

---

[2] See also United States v. King, 482 F.2d 768, 772 (D.C. Cir. 1973) ("[A] challenge to a magistrate's determination of probable cause to detain the accused . . . should be[] advanced by a motion in the district court.").

ORDER DENYING MOTION TO DISMISS COMPLAINT - 4

intent to manufacture, distribute, or dispense, a controlled substance[.]"  Id.  Ninth Circuit Model Criminal Jury Instruction 9.15 requires that the defendant (1) "knowingly possessed" a controlled substance, and (2) "possessed it with intent to distribute it to another person."

In addition, "[i]t is beyond dispute . . . that [§ 841(a)(1)] requires a jurisdictional nexus to the United States." United States v. Manuel, 371 F. Supp. 2d 404, 408 (S.D.N.Y. 2005) (noting that "Congress did not intend to prohibit every act of distributing drugs anywhere in the world, but only distribution in the United States.").  However, Ninth Circuit precedent makes clear that § 841(a)(1) applies with equal force to individuals who intend to distribute the controlled substances in a foreign country, "so long as that intent coincides at some point with possession in the United States." United States v. Gomez-Tostado, 172-73 (9th Cir. 1979).

## V.   DISCUSSION

### a.  Probable Cause

Defendants argue that Judge Peterson erred in finding probable cause.  They assert that the government failed to establish the requisite jurisdictional nexus for prosecution under § 841(a)(1), because the border patrol officers "scared [them] and made them enter the United States." Dkt. #41 at 2.  For the purpose of the preliminary hearing, defendants do not dispute that they intended to distribute controlled substances in Canada. Dkt. #41 at 3.  Still, they argue that the government has not established probable cause, contending that the actions of the border patrol officers stripped them of their volition in entering United States territory while possessing large quantities of controlled substances.  The Court disagrees and affirms Judge Peterson's probable cause finding for the following reasons.

As Judge Peterson recognized, two lines of cases provide guidance as the Court considers whether defendants are within the prosecutorial jurisdiction of the United States.  They have been deemed the "in-transit" cases and the "high-seas" cases. See, e.g., United States v. Cafiero, 242 F. Supp. 2d 49, 52-54 (D. Mass. 2003).  The "in-transit" cases involve defendants who possess controlled substances with an intent to distribute them in a foreign country, but who take international flights with scheduled stops in the United States.  The "high-seas" cases, on the other hand, involve extraterritorial seizures of controlled substances aboard vessels in

ORDER DENYING MOTION TO DISMISS COMPLAINT - 5

international waters.  While courts in "in-transit" cases have found intent where a defendant possesses controlled substances within the United States, even if he intends to distribute them in a foreign country, see, e.g., United States v. Muench, 694 F.2d 28, 33 (2d Cir. 1982); United States v. McKenzie, 818 F.2d 115, 119-20 (1st Cir. 1987), courts in "high-seas" cases find intent only where there is evidence establishing that the defendants intended to bring controlled substances into and distribute them in the United States, see, e.g., United States v. Hayes, 653 F.2d 8, 15 (1st Cir. 1981).

Defendants assert that their case is akin to the "high-seas" line of cases.  Dkt. #41 at 18.  To support this argument, they rely heavily upon United States v. Cafiero, a case Judge Peterson found distinguishable from the instant matter.  Cafiero involved an Italian citizen who boarded an Air Europe flight from Mexico to Italy with no scheduled stops.  Cafiero, 242 F. Supp. 2d at 50.  While aboard the flight, Cafiero caused a disturbance, which led to an emergency landing in Boston.  Id. at 50-51.  U.S. law enforcement officers escorted defendant from the plane, conducted a search, and found 180 grams of cocaine on his person.  Id. at 51.  Cafiero appeared for a preliminary hearing before a magistrate judge, who determined there was not probable cause to believe that Cafiero possessed the cocaine with intent to distribute it in the United States.  Id.  The magistrate judge dismissed the complaint, and the government filed a new complaint charging Cafiero with simple possession of cocaine in violation of 21 U.S.C. § 844.  Id.  The parties appeared before another magistrate judge, who found probable cause for the simple possession charge, "regardless of the fact that [Cafiero's] presence in the United States was involuntary."  Id.  Thereafter, Cafiero filed a motion to dismiss before the district judge, who dismissed the complaint.  Id. at 55.  The district judge found the facts "more akin to those of the high seas defendants than the in-transit travelers," and concluded that the government "lack[ed] the necessary jurisdictional nexus to prosecute Cafiero for possession with intent to distribute or for simple possession."  Id. at 54-55.

Defendants contend that the instant matter is analogous to Cafiero because they did not act with volition when they engaged in a so-called "technical entry" into the United States.  Dkt. #41 at 17.  Their reliance on Cafiero is misplaced.  As Judge Peterson highlighted, the plane

ORDER DENYING MOTION TO DISMISS COMPLAINT - 6

Cafiero boarded was in international airspace when it was unexpectedly ordered to land in the United States.  See United States v. Cafiero, 242 F. Supp. 2d at 54-55.  Cafiero exercised zero operational control over the aircraft, and the district court found the fact pattern characteristic of an extraterritorial seizure, like those involved in the high-seas cases.  Id.  The district court determined that Cafiero could not "be lumped with those in-transit travelers who 'choose to pass through this country, however briefly.'"  Id. at 54 (quoting McKenzie, 818 F.2d at 120).

      The facts of the instant matter do not fit as neatly into the Cafiero decision as defendants suggest.  Although defendants argue that "Mr. Steele was deprived of any free will or volition to choose . . . when the border patrol officers told Mr. Steele and Mr. Ferner that they *needed* to go through the port of entry," Dkt. #41 at 11, their assertion is unpersuasive.[3]  Ultimately, defendants faced a choice between violating Canadian traffic laws on a one-way street, or following the border patrol officers' instructions to come through the POE. Dkt. #34-1 at 19:12-25.  Defendants chose the latter.  Even assuming defendants did not originally plan to cross into the United States, because they chose to proceed at the officers' direction, they cannot convincingly argue that they did so entirely against their will.[4]  Regardless of whether defendants intended their pass through the United States-Canada border to be brief, and regardless of the fact that they intended to distribute their controlled substances in Canada, "that

---

[3] As the government notes, although Ferner was the passenger in the car, he is charged under 18 U.S.C. § 2, under which he is "punishable as a principal."  Dkt. #44 at 11 n.7.  Defendants' assertion that Ferner acted without volition because he was in the passenger's seat is unconvincing and does not vitiate a finding of probable cause. Dkt. #41 at 17; see also Dkt. #22-3 at 7:6-7 (Ferner asserting that "*we* totally took a wrong turn that put us at the border, and *we* couldn't turn around") (emphasis added).

[4] In light of the existing record, defendants overstate the border patrol officers' alleged use of "scare tactics."  It is reasonable to conclude, based on the video recording of the border patrol officers, that defendants were "scared" because they seemingly had not planned to enter the United States. Nothing in the record suggests that the border patrol officers used "scare tactics."  The evidence *does* reflect the officers waving defendants through the POE, an action a reasonable person would expect from a border patrol officer as he or she approached the border.  Ultimately, defendants volitionally drove toward the POE, and when faced with the border patrol officers waving them through the border, they chose to proceed.  Although the Court finds any alleged use of "scare tactics" does not vitiate a probable cause finding, to the extent there is a factual dispute regarding the border patrol officers' behavior, the Court does not foreclose the possibility of holding an evidentiary hearing on a motion to dismiss separate and apart from the instant probable cause determination.

ORDER DENYING MOTION TO DISMISS COMPLAINT - 7

intent coincide[d] . . . with possession in the United States" when defendants volitionally drove their vehicle through the POE. Gomez-Tostado, 597 F.2d at 173. The Court agrees with Judge Peterson that "this matter [is] more analogous to the in-transit cases," Dkt. #40 at 7, and finds that defendants' voluntary actions supplied the requisite jurisdictional nexus under 28 U.S.C. § 841(a)(1). Accordingly, the Court affirms Judge Peterson's finding of probable cause and DENIES defendants' motion to dismiss the complaint.

### b. Drafts of Complaint

Defendants also argue that the government should produce drafts of the complaint and attached affidavit pursuant to the Jencks Act. See Dkt. #41 at 20. At the preliminary hearings on June 1, 2020 and June 3, 2020, the government called Special Agent LeCompte as its sole witness. During the June 3 hearing, defense counsel asked Special Agent LeCompte whether anyone had edited any drafts of the complaint and affidavit before he signed it. See Dkt. #34-2 at 9:23-24. Special Agent LeCompte testified that he had sent the draft to the Assistant U.S. Attorney, who had edited it, and that he believed he still had copies of the drafts on his computer. Id. at 9:25-10:19. Defense counsel then requested that the drafts be produced as required Jencks material. Id. at 10:20-21. Judge Peterson heard oral argument on this issue and requested additional briefing before denying defendants' request. See Dkt. #37.

Pursuant to the Jencks Act, "[a]fter a witness called by the United States has testified on direct examination, the court shall . . . order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(a). A statement includes "a written statement made by said witness and signed or otherwise adopted or approved by him." Id. § 3500(e)(1). The Jencks Act is incorporated into the Federal Rules of Criminal Procedure under the virtually identical Rule 26.2. Fed. R. Crim. P. 26.2.

Although case law regarding the applicability of Jencks to drafts of complaints is sparse, the government argues that Special Agent LeCompte's drafts are not producible because "under a plain reading of the statute (or Rule 26.2), a draft statement that is not signed or otherwise adopted or approved is not a written statement for purposes of Jencks." Dkt. #44 at 14 (citing

ORDER DENYING MOTION TO DISMISS COMPLAINT - 8

United States v. Kaiser, 660 F.2d 724, 732 (9th Cir. 1981)). In Kaiser, the government produced a DEA Special Agent's final report, but not a handwritten draft. Kaiser, 660 F.2d at 731-32. The Ninth Circuit found that the draft was not producible because it was not intended as a final statement and accordingly, it was not "adopted or approved" by the Special Agent. Id. After analyzing Kaiser and additional relevant case law, Judge Peterson determined that the drafts were beyond the scope of Jencks, soundly reasoning that,

> Here, there is no suggestion that any draft of the complaint and affidavit are substantially different than the final version. Similarly, there are no allegations that Special Agent LeCompte intended to approve or adopt earlier drafts. Although defendants assert that he "signed or otherwise approved the draft affidavit" when he forwarded it to the Assistant United States Attorney, Special Agent LeCompte testified that he forwarded it for edits before he signed it, indicating he was aware the language of the draft could change.

Dkt. #37 at 4-5 (citations omitted). The Court agrees with Judge Peterson's analysis. Defendants' bald assertion that "there are substantial differences between the draft and final version" of the complaint and affidavit, see Dkt. #41 at 20, is unsupported by the record. The Court finds that Special Agent LeCompte's drafts are not producible Jencks material and therefore DENIES defendants' request for their disclosure.

Defendants have also requested that the Court (1) perform *in camera* review of all drafts of the complaint and (2) require the government to file all drafts of the complaint under seal for appellate review. Other than bare assertions, defendants have made no plausible showing that the drafts contain any statements adopted by Special Agent LeCompte or that they contain any substantial changes. Cf. United States v. Henke, 222 F.3d 633, 642-43 (9th Cir. 2000) (upholding district court's denial of request for *in camera* review of interview notes where "defendants made no showing that they might discover something exculpatory or impeaching [or] that the notes were used or adopted by the witness"). Defendants' requests that the Court perform *in camera* review and require the government to file the complaint drafts under seal are accordingly DENIED.

ORDER DENYING MOTION TO DISMISS COMPLAINT - 9

## VI. CONCLUSION

For all the foregoing reasons, the Court DENIES defendants' motion to dismiss the complaint for lack of probable cause (Dkt. #41). Additionally, as described above, the Court DENIES defendants' requests related to the government's disclosure of drafts of the complaint and attached affidavit.[5]

IT IS SO ORDERED.

DATED this 13th day of August, 2020.

*[signature]*
Robert S. Lasnik
United States District Judge

---

[5] The government's motion to file an overlength response (Dkt. #45) is GRANTED.

ORDER DENYING MOTION TO DISMISS COMPLAINT - 10